IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:18-cv-85 (WOB-CJS)

UNITED STATES OF AMERICA                                        PLAINTIFF

VS.                          MEMORANDUM OPINION AND ORDER

KARNAIL SINGH                                                   DEFENDANT

The United States brings this action under 8 U.S.C. § 1451(a) to revoke
Defendant Karnail Singh's citizenship, alleging that Singh illegally procured his
naturalization by *inter alia*, concealing his use of two identities and his prior
immigration history. The Complaint sets forth five "counts," or rather five separate
grounds for revoking Singh's certificate of naturalization:

| | |
|---|---|
| **Count I:** | Singh was Not Lawfully Admitted for Permanent Residence due to Fraud or Willful Misrepresentation. |
| **Count II:** | Singh was Not Lawfully Admitted for Permanent Residence Because the Immigration and Naturalization Service Lacked Jurisdiction to Adjust his Status. |
| **Count III:** | Singh Lacked the Requisite Good Moral Character for Naturalization by Virtue of Having Committed Unlawful Acts. |
| **Count IV:** | Singh Lacked the Requisite Good Moral Character for Naturalization by Virtue of Having Provided False Testimony. |
| **Count V:** | Singh Procured his Citizenship by Concealment of a Material Fact or Willful Misrepresentation. |

*United States v. Karnail Singh*

1

This matter comes before the Court on Defendant Singh's motion to dismiss. (Doc. 6). The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. Accordingly, the matter is ripe for disposition.

For the reasons that follow, the Court will grant the motion in part and deny it in part. The Court will only dismiss Count I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. First Asylum Application and Deportation Order

On approximately January 21, 1992, Defendant Singh submitted a Form I-589 asylum application ("**First Asylum Application**") to the Immigration and Naturalization Service ("INS").[1] (Doc. 1, ¶ 7). The application was submitted under the name KARNAIL SINGH DHILLON and stated that he was born in January 1963 in India and that he last entered the United States in Los Angeles, California on December 28, 1990. *Id.* at ¶¶ 7–8. As part of the application process, Singh was fingerprinted and then signed the application, certifying that the application and accompanying documents were true and correct. *Id.* at ¶¶ 9–10. In connection with

---

[1] On March 1, 2003, INS was dissolved and many of its relevant functions were transferred to the Department of Homeland Security ("DHS") and its sub-agencies, including the United States Citizenship and Immigration Services ("USCIS"). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 101, 451, 455, 471, 701, 110 Stat. 2135, 2142, 2195–96, 2200, 2205, 2218–19 (codified as amended at 6 U.S.C. §§ 111, 271, 275, 291) and accompanying notes. Because several of the events at issue here occurred prior to 2003, either INS or USCIS will be referred to where factually appropriate.

his First Asylum Application, Singh submitted biographic information in Form G-325, dated November 20, 1991 ("**1991 Form G-325**") (Doc. 1-3). In that form, Singh represented: (i) his name as KARNAIL SINGH DHILLON; (ii) he was born in January 1963, in India; (iii) he had used no other names; and (iv) that GURMAIL SINGH and JEET KAUR are his father and mother, respectively. (Doc. 1, ¶¶ 11–12).

On January 5, 1993, an INS officer interviewed Singh regarding his First Asylum Application. *Id.* at ¶ 13. In the interview, Singh reaffirmed the truth of the representations he provided in his First Asylum Application by again signing his application, certifying that the application and all accompanying documents were true and correct. *Id.* at ¶ 14. On September 29, 1993, INS denied Singh's First Asylum Application. *Id.* at ¶ 15. Singh subsequently filed an untimely letter of rebuttal and attached a warrant for his arrest in India, indicating that he committed or is suspected of having committed terrorist activity and murder in violation of the Indian Penal Code. *Id.*

On December 7, 1993, INS initiated deportation proceedings against Singh and issued a Form I-221, Order to Show Cause and Notice of Hearing ("OSC"). *Id.* at ¶ 16. INS alleged Singh was deportable under 8 U.S.C. § 1252(a)(1)(B) because he entered the United States without having been inspected and admitted or paroled. *Id.* INS served the OSC on Defendant by certified mail on January 4, 1994. *Id.* Singh personally appeared in immigration court. *Id.* at ¶ 17. Singh was then personally served with a Notice of Hearing, stating the date and time of a third hearing. *Id.*

When Singh failed to appear, the immigration judge entered an order *in abstentia* on January 25, 1995, ordering that Singh be deported to India. *Id.* Singh, however, did not depart the United States between January 1995 and May 2002. *Id.* at ¶ 18.

## B.    Second Asylum Application and Application for Permanent Residence

On July 20, 1994, Singh submitted a second Form I-589 asylum application ("**Second Asylum Application**") to INS, this time under the name KARNAIL SINGH. *Id.* at ¶ 19. In the application, Singh represented that: (i) he was born in December 1968 in India; (ii) he was detained in jail without charges for a total of approximately eleven months, beginning in January 1992; and (iii) he last entered the United States at San Ysidro, California on May 5, 1994, after transiting through Mexico. *Id.* at ¶ 20. Singh was fingerprinted and signed his Second Asylum Application, certifying that the application and all accompanying documents were true and correct. *Id.* at ¶¶ 21–22.

In connection with his Second Asylum Application, Singh submitted biographic information in a second Form G-325A, dated July 11, 1994 ("**1994 Form G-325A**") (Doc. 1-4), in which he represented: (i) his name as KARNAIL SINGH; (ii) he was born in December 1968, in India; (iii) that TARSEM SINGH and TARA KAUR are his father and mother, respectively; and (iv) that he had used no other names, given that he left blank the question requesting that he provide "All Other Names Used." *Id.* at ¶¶ 25–26.

On September 21, 1995, Christine Smith, on behalf of Singh and representing

herself as Singh's wife, filed a Form I-130 petition ("**Visa Petition**"). *Id.* at ¶ 28. KARNAIL SINGH was listed as the visa beneficiary. *Id.* In the petition, Smith represented: (i) that Singh was born in December 1968, in India; (ii) his last arrival in the United States was without inspection on May 5, 1994; and (iii) that Singh had never been under immigration proceedings, including exclusion, deportation, rescission, or judicial proceedings. *Id.* at ¶ 29. In connection with the petition, Singh submitted biographic information in a third Form G-325A, dated September 21, 1995 ("**1995 Form G-325A**"), in which he represented: (i) his name as KARNAIL SINGH: (ii) he was born in December 1968, in India; (iii) TARSEM SINGH and TARA KAUR are his father and mother, respectively; and (iv) that with respect to "All Other Names Used," there were "None." *Id.* at ¶¶ 30–31.

On May 30, 1996, Singh submitted a Form I-485 application to register for permanent residence or adjust his status ("**Adjustment Application**") (Doc. 1-5), under the name KARNAIL SINGH. (Doc. 1, ¶ 33). In the application, Singh stated: (i) that he was born in December 1968, in India, and last arrived in the United States on May 5, 1994; (ii) the first name of his father and mother, respectively, is TARSEM and TARA; (iii) he had never been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law, or ordinance, excluding traffic violations; (iv) he had never been deported from the United States or removed from the United States at government expense or excluded within the past year and was not currently in exclusion or deportation proceedings; and (v) that he had never, by fraud or willful

*United States v. Karnail Singh*

misrepresentation of a material fact, sought to procure, or procured, a visa, other documentation, entry into the United States, or any other immigration benefit. *Id.* at ¶¶ 33–34; (Doc. 1-5).

On May 5, 1996, Singh signed his Adjustment Application, certifying that the application and evidence submitted with it was true and correct. (Doc. 1, ¶ 35). In connection with his Adjustment Application, Singh submitted biographical information in a fourth Form G-325A, dated May 5, 1996 ("**1996 Form G-325A**"). In form Singh represented: (i) his name as KARNAIL SINGH; (ii) he was born in December 1968, in India; and (iii) that TARSEM SINGH and TARA KAUR are his father and mother, respectively. Singh left blank the question requesting that he provide "All Other Names Used." *Id.* at ¶¶ 37–38.

On March 11, 1997, an INS officer interviewed Singh regarding his Adjustment Application. *Id.* at ¶ 40. During the interview, Singh indicated that the police in India jailed him for eleven months in 1992 and 1993, without a court hearing, for possession of firearms. *Id.* at ¶ 41. Singh also reiterated his application responses in the negative; specifically: he was not currently in deportation proceedings and he had never sought to procure an immigration benefit by fraud or willful misrepresentation of a material fact. *Id.* Singh then signed his Adjustment Application a second time, affirming that any changes he made to the application in the course of the interview were based on sworn testimony. *Id.* at ¶ 42.

On May 9, 2002, INS approved Singh's Adjustment Application. *Id.* at ¶ 45.

Sing then sent a letter to USCIS on April 16, 2003, requesting to withdraw his Second Asylum Application. *Id.* at ¶ 46. On April 22, 2003, USCIS withdrew Singh's Second Asylum application. *Id.*

### C.    Naturalization Proceedings

On July 7, 2008, Singh filed a Form N-400 application for naturalization ("**Naturalization Application**") (Doc. 1-6), under the name KARNAIL SINGH, claiming he was born in December 1968. *Id.* at ¶ 47. Several questions in the application are relevant to the allegations in this matter.

First, in Part 1, question C of the application states, "If you have ever used other names, provide them below." Singh wrote in "None." *Id.* at ¶ 48. Second, in Part 10(D), question 15 asks, "Have you ever committed a crime or offense for which you were not arrested?" *Id.* at ¶ 51 (emphasis in original). Singh marked the box for "No." *Id.* Next, in Part 10(D), question 23 inquires: "Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?" (emphasis in original). *Id.* at ¶ 54. Again, Singh marked the box for "No." *Id.* Then, in Part 10(D), question 24 asks: "Have you ever lied to any U.S. government official to gain entry or admission into the United States?" *Id.* at ¶ 59 (emphasis in original). Singh again marked the box for "No." *Id.* Lastly, in Part 10E, question 27 inquires: "Have you ever been ordered to be removed, excluded or deported from the United States?" *Id.* at ¶ 62 (emphasis in original). Singh marked the box for "No." *Id.*

On about June 30, 2008, Singh signed his Naturalization Application under penalty of perjury, thereby certifying that his application and the evidence submitted with it were true and correct. *Id.* at ¶ 65.

On October 16, 2008, Singh appeared before a USCIS officer and was placed under oath for an interview concerning the information Singh provided in his Naturalization Application. *Id.* at ¶ 66. When the officer asked Singh to verify Part 10(D), question 15, Singh orally responded in the negative, thereby testifying under oath that he had never committed a crime or offense for which he had not been arrested. *Id.* at ¶ 67.

Five corrections, however, were made to Singh's Naturalization Application during the interview,[2] and at the conclusion Singh again signed the application, thereby certifying under penalty of perjury that the information provided in the application (as revised), as well as any evidence submitted in support of the application, was true and correct to the best of Singh's knowledge and belief. *Id.* at ¶ 70. That same day, USCIS approved Singh's Naturalization Application. *Id.* at ¶ 71.

Thereafter, on January 15, 2009, Singh was administered the oath of allegiance, granted United States citizenship, and issued Certificate of

---

[2] The following five corrections to Singh's Naturalization Application are numbered 1 through 5 in the application, (Doc. 1-6 at 11): (1) Singh is divorced, *id.* at 3; (2) Singh traveled to India for three weeks in August 2008, *id.* at 5; (3) Singh divorced Smith in August 2008, *id.*; (4) Singh was cited for driving under the influence ("DUI") but was not jailed, *id.* at 9; and (5) Sing was arrested in India for political reasons. *Id.*

Naturalization No. 31891035. *Id.* at ¶ 72.

### D. Federal Criminal Charges and Guilty Plea

On June 16, 2013, Singh was crossing the Ambassador Bridge in Detroit, Michigan, and presented his passport card to United States Customs and Border Protection ("CBP") officers in order to gain entry into the United States. The name on the passport card was KARNA1L SINGH, and the date of birth was listed as December 1968. *See* (Doc. 1-2 at 4, 19). In speaking with the CBP officers, Singh stated that he had never used any other names or spelling variations of his name; nor had he ever used any other dates of birth. *Id.* at 19.

Based on these events, Singh was charged on August 16, 2013, in a two-count indictment with: (1) knowingly using a passport unlawfully obtained or otherwise procured by fraud or means of a false claim or statement, in violation of 18 U.S.C. § 1546(a); and (2) knowingly and willfully making false, fictitious, and fraudulent material statements in a matter within the jurisdiction of the executive branch of the United States (*i.e.*, Singh's conversation with CBP officers), in violation of 18 U.S.C. § 1001(a)(2). *Id.* at 18–19; (Doc. 1, ¶ 73).

On January 23, 2014, Singh entered into a Plea Agreement, in which the government agreed to dismiss Count II (making a false material statement), and Singh agreed to plead guilty to Count I (use of a fraudulently obtained passport). (Doc. 1, ¶ 74); (Doc. 1-2, Plea Agreement at 1, 7).

The factual basis for the guilty plea, to which Singh agreed, establishes that

*United States v. Karnail Singh*

(1) under the name KARNAIL SINGH DHILLON (born in January 1963), he applied for asylum in 1991, he was denied asylum, ordered deported, and failed to appear for deportation as ordered; and (2) under the name KARNAIL SINGH (born in December 1968), he applied for asylum a second time in 1994, applied for his status to be adjusted to that of a permanent resident as the spouse of a United States citizen, failed to disclose on his Adjustment Application that he had previously applied for and been denied immigration benefits under another identity, was granted permanent resident status as a result of such fraud, withdrew his Second Asylum Application, and ultimately applied for and obtained naturalization as a United States citizen. (Doc. 1, ¶ 75); (Doc. 1-2 at 2–3).

On May 30, 2014, based on the Plea Agreement, the district court found Singh guilty of violating 18 U.S.C. § 1546(a), dismissed Count I on the government's motion, and sentenced Singh to 12 months' probation. (Doc. 1, ¶ 76); (Doc. 1-2 at 21–23).

Seeking to now revoke Singh's naturalization, the Government filed this action on May 18, 2018. Attached to the Complaint, as required by 8 U.S.C. § 1451(a) to show good cause for the action, is the affidavit of Heather Wylde, Immigration Services Officer with USCIS. (Doc. 1-1).

## LEGAL STANDARD

The Federal Rules of Civil Procedure require that pleadings, including complaints, contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this requirement, a

*United States v. Karnail Singh*

complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A complaint may be attacked for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

When considering a Rule 12(b)(6) motion to dismiss, "all factual allegations in the complaint must be presumed to be true" and the court must draw all "reasonable inferences" in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To that end, a court must judge the sufficiency of a complaint under a two-pronged approach: (1) disregard all "legal conclusions" and "conclusory statements"; and (2) determine whether the remaining "well-pleaded factual allegations," accepted as true, "plausibly give rise to entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009).

Accordingly, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* at 678. That is, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## ANALYSIS

### I. Legal Framework

Although Singh's motion to dismiss does not challenge whether the Government has satisfied the statutory requirements for revoking his citizenship, the Complaint is best understood against the backdrop of the relevant law concerning both naturalization and denaturalization.

### A. Naturalization Requirements and the Denaturalization Statute

Along the path to U.S. citizenship "there must be strict compliance with all the congressionally imposed prerequisites." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981); *see also* 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of [the Immigration and Nationality] Act," 8 U.S.C. §§ 1101 *et seq.* ("INA")). The prerequisites for naturalization are set forth in 8 U.S.C. § 1427, which provides in relevant part that:

*United States v. Karnail Singh*

> No person . . . shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, ***after being lawfully admitted for permanent residence***, within the United States **for at least five years** . . ., (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of ***good moral character*** . . .

8 U.S.C. § 1427(a) (emphasis added). "Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside." *Fedorenko*, 449 U.S. at 506 (citing 8 U.S.C. § 1451 (a)); *United States v. Kalymon*, 541 F.3d 624, 627 (6th Cir. 2008).

A person may be denaturalized by a civil denaturalization order issued in federal court pursuant to 8 U.S.C. § 1451(a), (f).[3] Section 1451(a), in fact, imposes a duty on the government to seek such an order by suing "for the purpose of revoking and setting aside [an] order admitting [a] person to citizenship and cancelling the certificate of naturalization" if the naturalization order or certificate was (1) "illegally procured" or (2) "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a); *Kungys v. United States*, 485 U.S. 759, 767 (1988). With respect to the second basis for revocation, the Supreme Court has explained that:

> "[T]he provision plainly contains four independent requirements: [1] the naturalized citizen must have misrepresented or concealed some fact,

---

[3] This action does not involve the criminal counterpart for denaturalization, 18 U.S.C. § 1425(a), under which a conviction results in the individual's naturalization being *automatically revoked. Maslenjak v. United States*,137 S. Ct. 1918, 1923 (2017).

*United States v. Karnail Singh*

> [2] the misrepresentation or concealment must have been willful, [3] the fact must have been material, and [4] the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment."

*United States v. Ahmed*, 735 F. App'x 863, 866 (6th Cir. 2018) (quoting *Kungys*, 485 U.S. at 767).

In an action to revoke the citizenship of a naturalized citizen, the government bears the burden of proving that revocation of citizenship is justified by "clear, unequivocal, and convincing" evidence that does "not leave the issue in doubt." *Ahmed*, 735 F. App'x at 866 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1943)).[4] "[O]nce a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally or by willful misrepresentation, it has no discretion to excuse the conduct" or "refrain from entering a judgment of denaturalization." *See, e.g.*, *Federenko*, 449 U.S. at 517; *INS v. Pangilinan*, 486 U.S. 875, 883–84 (1988); *United States v. Al-Banna*, No. 05-4287, 2006 WL 3203745, at *2 (6th Cir. Nov. 7, 2006).[5]

In this particular case, the thrust of the Government's complaint is that Singh: (i) willfully, (ii) misrepresented or concealed numerous facts, (iii) that were material, and (iv) therefore Sing procured his citizenship illegally or by misrepresentation or

---

[4] "This burden is substantially identical with that required in criminal cases—proof beyond a reasonable doubt." *Klapprott v. United States*, 335 U.S. 601, 612 (1949).

[5] The Court notes that because this is a civil denaturalization proceeding, there is no right to a jury trial. *E.g.*, *Luria v. United States*, 231 U.S. 9, 17, 27–28 (1913).

*United States v. Karnail Singh*

14

concealment. (Doc. 1, ¶¶ 96–97, 100, 109, 119, 125, 132–136). In particular, it is alleged in Count V that, in the naturalization proceedings alone, Singh misrepresented the following information:

- his use of other names;

- his provision of false or misleading information to a United States government official while applying for an immigration benefit;

- his representations he made in support of his naturalization application that—as compared to previous applications and forms—cannot simultaneously be true;

- that an immigration judge previously had ordered Singh deported; and

- that Singh concealed and willfully misrepresented at his naturalization interview the fact that he had committed a crime for which he had not been arrested, (*i.e.*, his violation of 18 U.S.C. § 1001(a) by virtue of the materially false information he provided to the government in his First and Second Asylum Applications, in several Forms G-325A, and in his Adjustment Application).

(Doc. 1, ¶¶ 132–33).

In addition, the Government alleges in Counts I, III, and IV that in light of Singh's misrepresentations throughout his immigration history, Singh was naturalized without having satisfied prerequisites one and three. *Cf.* 8 U.S.C. § 1427(a)(1), (3). In these Counts, the Government's basis for revoking Singh's naturalization is twofold. First, Singh was allegedly not "lawfully admitted for permanent residence . . . for at least five years." *Id.*; *see* (Doc. 1 at 18–20). And second, the Government avers that Sing did not possess the requisite "good moral character" in order to be naturalized. 8 U.S.C. § 1427(a)(3); (Doc. 1 at 21–24). The Court will

*United States v. Karnail Singh*

address the two requirements in turn.[6]

### 1. The "Lawfully Admitted for Permanent Residence" Requirement

Section 1427(a)(1) of the INA requires an applicant for naturalization to have been "lawfully admitted for permanent residence" and thereafter resided continuously in the United States for the statutory period of at least five years immediately prior to filing the naturalization application. "Lawfully admitted for permanent residence" is defined as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws . . ." 8 U.S.C. § 1101(a)(20). Because this definition is ambiguous (and all but completely unhelpful), the Sixth Circuit in *Turfah v. United States Citizenship & Immigration Servs.*, 845 F.3d 668 (6th Cir. 2017) joined other circuit courts of appeals and adopted the Board of Immigration Appeals' ("BIA") interpretation of the lawful-admission requirement, as stated in *In re Koloamatangi*, 23 I. & N. Dec. 548 (BIA 2003). *Turfah*, 845 F.3d at 672.

As the Sixth Circuit explained, "lawful admission requires 'compliance with substantive legal requirements, not mere procedural regularity'" such that, for example, "where [lawful permanent resident] status ha[s] been granted in violation

---

[6] Singh does not challenge whether the allegations meet the legal standards for the four elements of denaturalization stated in *Kungys*. Therefore, the Court will not scrutinize whether the Complaint satisfies each element, and accordingly Count V will remain viable.

*United States v. Karnail Singh*

16

of the underlying substantive immigration laws" the individual has not "lawfully" been admitted for permanent residence. *Id.* (quoting *Koloamatangi*, 23 I. & N. Dec. at 550).

Thus, in broad terms, an alien is considered to have been "not lawfully admitted if they obtained their [lawful permanent resident] status through 'fraud, or had otherwise not been entitled to it.'" *Id.* (quoting *Koloamatangi*, 23 I. & N. Dec. at 550). The phrase "'had otherwise not been entitled to it' . . . means that an alien is not lawfully admitted if he gains [lawful permanent resident] status due to a mistake by the government—even if the alien did not commit any fraud in obtaining that status." *Id.* (citations omitted). The allegations in Counts I and II concern the lawful-admission requirement.

### i. Count I

In Count I, the Government asserts that Singh failed to meet the lawful-admission requirement for naturalization under 8 U.S.C. §§ 1429 and 1427(a)(1) because his permanent resident status was granted only as a result of willful and material misrepresentations made in his Adjustment Application and other documents leading up to his Adjustment Application that—when compared to his previous deportation proceedings and to representations Singh made in his First Asylum Application and in the 1991 Form G-325A submitted in connection with it—cannot simultaneously be true.

These misrepresentations included: (i) Singh's use of two different names and

dates of birth; (ii) his failure to indicate his own use of other names; (iii) the different names Singh provided for both his father and mother; (iv) his misrepresentation about the fact that he was in deportation proceedings at the time of his status adjustment; and (v) his failure to truthfully respond that he had in fact sought to procure an immigration benefit by fraud or willful misrepresentation of a material fact. (Doc. 1, ¶¶ 95–98).

As a matter of law, the Government cannot prevail on Count I. The Supreme Court rejected the same claim the Government makes here when it held that "the 'concealment or misrepresentation' clause of § 1451(a) . . . is limited to falsehoods or deceptions *in the naturalization proceeding.*" *Kungys*, 485 U.S. at 773–74 (emphasis added) ("[W]e are unpersuaded by the Government's argument that a misrepresentation in the visa proceeding 'procures' the naturalization because it obtains United States residence, which in turn is a prerequisite to naturalization" under 8 U.S.C. § 1429.). The allegations in Count I concern misrepresentations *before* the naturalization proceedings. Thus, as in *Kungys*, so too here—the Government cannot prevail on Count I. Accordingly, Count I is dismissed with prejudice.

## ii. Count II

Next, Count II alleges that Singh was not lawfully admitted for permanent residence because the immigration judge that ordered Singh deported in 1995 retained exclusive jurisdiction to review any application to alter Singh's immigration status, and therefore INS lacked jurisdiction to review and grant Singh's Adjustment

Application, which was submitted on May 30, 1996. (Doc. 1, ¶¶ 104–108).

Setting aside Singh's argument that the immigration court lacked jurisdiction, which the Court will address below, the law supports the Government's claim in Count II. *See* 8 C.F.R. § 1245.2, 245.2(a)(1).[7] Even though, in part, Singh may have gained lawful permanent status "due to a mistake by the government," the Court concludes at the pleading stage that the Government's factual allegations show that Singh was "not lawfully admitted" insofar as it is plausible that INS erroneously granted Singh's Adjustment Application. *See Turfah*, 845 F.3d at 672 (citations omitted). Therefore, the Court will not dismiss Count II.

### 2. The "Good Moral Character" Requirement

In Counts III & IV, the Government alleges that Singh was ineligible for naturalization at the time it was granted because he lacked the requisite "good moral character" for naturalization under 8 U.S.C. § 1427(a)(3). Subsection (a)(3) requires that an applicant continue to be "a person of good moral character" during the statutory period beginning five years prior to the date when the applicant files their

---

[7] The INA, or, more specifically 8 U.S.C. §§ 1229a(a)(1), 1229(a)(1), does not explain when or how jurisdiction vests with the immigration judge. "Because Congress did not address that question, the agency had some discretion in fashioning a set of jurisdictional requirements." *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 313 (6th Cir. 2018). As relevant here, the agency's regulations establish that "In the case of any alien who has been placed in deportation proceedings or in removal proceedings (other than as an arriving alien), the immigration judge hearing the proceeding has exclusive jurisdiction to adjudicate any application for adjustment of status the alien may file." 8 C.F.R § 1245.2(a).

naturalization application until the oath of allegiance is administered. *Id.* § 1427(a)(3); 8 C.F.R. § 316.10(a). Here, Singh filed his Naturalization Application on July 7, 2008. (Doc. 1, ¶ 47). Thus, Singh was required to maintain a status of "good moral character" **from July 7, 2003,** *until* **January 15, 2009,** when Sing was administered the oath of allegiance. *Id.* at ¶¶ 72, 111, 121.

Congress enumerated several classes of conduct that constitute a *per se* bar on an applicant demonstrating "good moral character." 8 U.S.C. § 1101(f). The relevant example here is "giv[ing] false testimony for the purpose of obtaining" immigration or naturalization benefits. *Id.* § 1101(f)(6); *see also* 8 C.F.R. § 316.10(b) (specifying other instances in which an applicant "shall be found to lack good moral character").

There are, however, three limitations in applying § 1101(f)(6). "First, 'testimony' is limited to *oral* statements made under oath." *Kungys*, 485 U.S. at 780 (emphasis added); *Djokic v. Sessions*, 683 F. App'x 385, 389 (6th Cir. 2017). "Second, § 1101(f)(6) applies to only those misrepresentations made with the subjective intent of obtaining immigration benefits." *Kungys*, 485 U.S. at 780. Third, in contrast to § 1451(a), "the false testimony provisions of § 1101(f)(6) do not apply to 'concealments.'" *Id.* at 781. But, unlike § 1451(a), which requires that the misrepresented fact be "material," § 1101(f)(6) does not contain a materiality requirement for "false testimony." *Kungys*, 485 U.S. at 780.

Thus, as the Supreme Court held, at the end of the day an individual will be deemed "to be of bad moral character on account of having given false testimony if he

has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Id.*; *Djokic*, 683 F. App'x at 389. *Id.* § 1101(f)(6).

### i. Count III

In Count III, the Government asserts that Singh lacked good moral character based on violations of various federal criminal statutes. (Doc. 1, ¶¶ 113–116). Specifically, the Government alleges that during Singh's immigration and naturalization proceedings, Singh violated: 18 U.S.C. § 1546(a);[8] 18 U.S.C. § 1001(a);[9] and 18 U.S.C. § 1621(1),[10] when he subscribed as true the contents of his Naturalization Application (which allegedly contained false information) by signing and submitting it under penalty of perjury on both July 7, 2008, and at the conclusion

---

[8] 18 U.S.C. § 1546(a) makes it a crime to *inter alia* (i) "knowingly" state "under oath" or "subscribe[] as true, any false statement with respect to a material fact in any application" or other immigration document, or (ii) "knowingly present[] any such application, affidavit, or other document which contains any such false statement . . ."

[9] 18 U.S.C. § 1001(a) imposes criminal sanctions on anyone who "knowingly and willfully" (1) "falsifies" or "conceals" any "material fact"; (2) "makes any materially false, fictitious, or fraudulent statement or representation"; or (3) "makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry . . ."

[10] 18 U.S.C. § 1621(1) establishes the crime of perjury as the act of any person "having taken an oath before a competent" officer "that he will testify . . . or certify truly, or that any written testimony, . . . or certificate by him subscribed, is true," who then "willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . ."

of the naturalization interview on October 16, 2008. (Doc. 1, ¶¶ 113–115). These allegations fall within one or more of the "built-in limitations" of 8 U.S.C. § 1101(f)(6) for "false testimony." *Kungys*, 485 U.S. at 780–81.

Notwithstanding, in Count III, the Government seemingly relies on the "catch-all" provision in 8 U.S.C. § 1101(f), which establishes that "[t]he fact that any person is not within any of the enumerated classes shall not preclude a finding that for other reasons such person is or was not of good moral character." *See also* 8 C.F.R. § 316.10(b)(3)(iii) ("[An] applicant shall be found to lack good moral character if [they] . . . [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character . . ."); (Doc. 1, ¶¶ 82–83, 112, 116).

In light of the allegations in Count III, the Government has sufficiently pled that Singh lacked the requisite good moral character during the statutory period due to "acts that adversely reflect upon" his moral character (*i.e.*, the commission of federal crimes involving moral turpitude). Singh does not contend otherwise. Therefore, if later proven by "clear, unequivocal, and convincing" evidence, *Kungys*, 485 U.S. at 781, this would render Singh's "certificate of citizenship 'illegally procured,'" and his naturalization would have to be revoked pursuant to 8 U.S.C. § 1427(a)(3). *Fedorenko*, 449 U.S. at 506. Accordingly, Count III stands.

### ii. Count IV

In Count IV, the Government alleges Singh lacked good moral character because during his naturalization interview on October 16, 2008, and while under

oath, he "testified that he had never committed a crime or offense for which he was not arrested." (Doc. 1, ¶ 124). In fact, Singh had previously violated 18 U.S.C. § 1001(a) by virtue of having provided materially false information to the government in his First and Second Asylum Applications, his Adjustment Application, and multiple Forms G-325A. (Doc. 1, ¶ 125).

These allegations, accepted as true, state a plausibly claim because a false *oral* statement made during an interview with an official authorized "to administer oaths" and "to take testimony concerning any matter . . . affecting" naturalization qualifies as false testimony. *United States v. Haroon*, 874 F.3d 479, 483 (6th Cir. 2017) (quoting 8 U.S.C. § 1446(b)); *Kungys*, 485 U.S. at 780.

## II. Singh's Motion to Dismiss

In challenging the sufficiency of the Complaint, Singh does not contest the substantive merits. Instead, he makes two tangential arguments. First, he argues the government is barred from bringing this action because the Plea Agreement he entered into with federal prosecutors in the Eastern District of Michigan guaranteed that he would not face adverse immigration consequences "absent additional" or "future" criminal charges. (Doc. 6 at 4–5, 8–7).

Second, Singh interprets the Supreme Court's recent decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018) to mean that the immigration court that ordered him deported lacked jurisdiction to do so because the order to show cause ("OSC") was missing the date, time, and place of the hearing, (Doc. 10 at 2–4; (Doc. 14 at 9–13),

and therefore "the entire basis" for the Government's complaint lacks any merit. (Doc. at 12). The Court is unpersuaded.

### A. The Plea Agreement Does Not Bar This Action.

"Plea agreements are contractual in nature, so we use traditional contract law principles in interpreting and enforcing them." *United States v. Bowman*, 634 F.3d 357, 361 (6th Cir. 2011) (quoting *United States v. Harris*, 473 F.3d 222, 225 (6th Cir. 2006)). The interpretation and "construction of a plea agreement presents a question of law" for the court to decide. *United States v. Fitch*, 282 F.3d 364, 366 (6th Cir. 2002). To that end, a court "must give effect to the intent of the parties as expressed by the plain language in the plea agreement." *United States v. Beals*, 698 F.3d 248, 256 (6th Cir. 2012).

But because there exist constitutional implications beyond that which is present in the context of a run-of-the-mill contract, the government, as the drafter of the agreement, is held "to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in the plea agreement." *Bowman*, 634 F.3d at 361 (quoting *Harris*, 473 F.3d at 225). Thus, a court must "interpret ambiguities in plea agreements against the government." *United States v. Black*, 652 F. App'x 376, 380 (6th Cir. 2016).

Ambiguity exists in the agreement "if it is capable of more than one reasonable interpretation." *Id.* (citations and internal quotations omitted). At the end of the day, however, the driving force "in interpreting a plea agreement is not the parties' actual

*United States v. Karnail Singh*

24

understanding of the terms of the agreement; instead, an agreement must be construed *as a reasonable person* would interpret its words." *See, e.g., United States v. Moncivais*, 492 F.3d 652, 663 (6th Cir. 2007) (emphasis added); *United States v. Cook*, 607 F. App'x 497, 500 (6th Cir. 2015). If the government has breached a plea agreement, the appropriate remedy may be to either order specific performance or allow the defendant "to withdraw his plea." *Puckett v. United States*, 556 U.S. 129, 137 (2009); *United States v. Butler*, 297 F.3d 505, 514 (6th Cir. 2002).

First, the Plea Agreement is not ambiguous. The disputed provision in Singh's agreement, under the heading "Immigration Consequences of Guilty Plea," in full reads:

> Defendant acknowledges that he is a native of India and a naturalized citizen of the United States. Defendant's plea to this offense will ***not necessarily result*** in immigration consequences, but, in conjunction with possible future criminal charges, his guilty plea in this case may affect or even foreclose ***his eligibility to remain in this country***. Defendant has discussed these matters with his attorney in this case, but he expressly agrees that his decision to plead guilty is in no way conditioned upon or affected by the advice he has been given regarding any potential immigration consequences of his conviction(s). Defendant further agrees that because ***his decision to plead guilty in this case is wholly independent of the immigration consequences of a conviction,*** defendant agrees that he will not seek to challenge his guilty plea in any later proceeding via collateral attack on any basis relating to his immigration status or lack thereof in this country.

(Doc. 1-2 at 6–7).

Nothing in this paragraph precludes the Government from bringing this action. In fact, the provision explicitly provides that Singh's "decision to plead guilty

*United States v. Karnail Singh*

25

in [the Eastern District of Michigan] case is wholly independent of the immigration consequences of a conviction." Singh was thereby put on notice that a conviction as a result of his guilty plea could inevitably lead to adverse immigration consequences. It is irrelevant what "Singh understood" the agreement to mean, (Doc. 6 at 9), because "the parties' actual understanding of the terms of the agreement" has no bearing on its interpretation, and "instead, an agreement must be construed *as a reasonable person* would interpret its words." *See, e.g.*, *Moncivais*, 492 F.3d at 663. Therefore, the Plea Agreement does not bar this action.

To avoid this conclusion, Singh conveniently focuses solely on the second sentence in the above-quoted provision of the Plea Agreement. But Singh misinterprets that sentence. It does not "guarantee" that an adverse immigration proceeding will *never* be brought against him. The second sentence simply states that Singh's guilty plea as to the offense charged at the time "will *not necessarily* result in immigration consequences."

And the second half of the sentence does not lead to a different result. The phrase—"but, in conjunction with possible future criminal charges, his guilty plea in [the Eastern District of Michigan] may affect or even foreclose his eligibility to remain in this country"—merely offers *one* set of circumstances in which Singh's eligibility to remain in this country *might* change (*i.e.*, in the event that Singh becomes subject to other criminal charges). Thus, Singh's Plea Agreement permits the government to revoke Singh's citizenship, even absent additional criminal charges.

*United States v. Karnail Singh*

26

Nonetheless, Singh argues that the agreement provides "unequivocally" that "'*absent* future criminal charges,' his ability to remain in the United States will not be affected." (Doc. 6 at 8) (emphasis added). The word "absent," however, appears nowhere in the above-cited language. But even if the agreement were interpreted to require that Singh be subject to criminal charges in addition to those initially brought on August 16, 2013, as Singh urges, that requirement would be met here.

As detailed above, the Government alleges in Counts III and IV that Singh violated 18 U.S.C. §§ 1001(a), 1546(a), and § 1621(1) during the course of his naturalization proceedings, which occurred *after* Singh entered into the Plea Agreement, by virtue of providing false testimony in his interview with a USCIS officer and affirming the truth of the representations in his Naturalization Application.

Second, even construing the above passage in Singh's favor and against the Government, the provision, at best, would preclude an action that alters Singh's "eligibility to remain in this country." The instant action, however, is *not* an action to remove Singh from the country. Here, the Government merely requests an order from this Court revoking Singh's status as a naturalized citizen. Singh's argument is thus unavailing because he misunderstands the nature of this lawsuit.

Finally, it is well established that a plea agreement must be interpreted "as a whole." *Black*, 652 F. App'x at 380 (quoting *United States v. Randolph*, 230 F.3d 243, 249 (6th Cir. 2000)). The death knell here is a separate provision in Singh's Plea

Agreement. In paragraph 8, the Plea Agreement in plain terms provides that it "does not bind any government agency except the United States Attorney's Office *for the Eastern District of Michigan*." (Doc. 1-2 at 7) (emphasis added).

Although the Sixth Circuit has not directly weighed in on whether a United States Attorney in one judicial district may bind another in a plea agreement, *see United States v. Robison*, 924 F.2d 612 (6th Cir. 1991), virtually every other circuit court of appeals has. The consensus among these courts is that an explicit, unambiguous territorial limitation on the binding nature of a plea agreement should be enforced as written.[11] Thus, even if the agreement unambiguously stated,

---

[11] *See, e.g., United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998) ("When the express terms of a plea agreement set forth promises by 'the Government,' we have held that the 'plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction . . . (citation omitted)); *United States v. Gebbie*, 294 F.3d 540, 549–50 (3d Cir. 2002) (holding that when a U.S. Attorney uses "terms like 'the United States' and 'the Government' . . . in a plea agreement for specific crimes, that attorney speaks for and binds all of his or her fellow United States Attorneys with respect to those same crimes and those same defendants."); *United States v. Harvey*, 791 F.2d 294, 303 (4th Cir. 1986) ("Of course the Government may—and quite readily can—'agree' through its agents that only certain of its agents are to be obligated in particular respects, or that the Government's obligation is limited territorially or temporally, or that the Government's obligation is otherwise qualified."); *United States v. Van Thournout*, 100 F.3d 590, 594 (8th Cir. 1996) ("Absent an express limitation, any promises [regarding a plea agreement] made by an Assistant United States Attorney in one district will bind an Assistant United States Attorney in another district."); *United States v. Ingram*, 979 F.2d 1179, 1185 (7th Cir. 1992) (enforcing plea agreement as written where it was "unambiguous on its face" in that it "only bound the United States Attorney's Office for the District of Colorado"); *United States v. Johnston*, 199 F.3d 1015, 1021 (9th Cir. 1999) (holding that a plea agreement, stating that "this agreement does not bind or obligate governmental entities other than the

which it does not—that under no circumstance will an action be brought against Singh to revoke his Certificate of Naturalization—such a promise would be binding only on federal prosecutors in the Eastern District of Michigan. Therefore, nothing here bars the U.S. Attorney's Office in this district from bringing the instant action.

In short, the Plea Agreement is not ambiguous. Despite Singh's protestations, there is only one reasonable interpretation of the Plea Agreement: A reasonable person reading the Plea Agreement "as a whole" would understand that nothing in the contractual language explicitly prohibits the U.S. Attorney's Office for the Eastern District of Kentucky from initiating this action.

### B. *Pereira v. Sessions* has No Impact on the Outcome of this Case.

Next, Singh contends that in the wake of *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), jurisdiction never vested in the immigration court that ordered him deported because the OSC (the predecessor to a Notice to Appear), issued on December 7, 1993 to initiate deportation proceedings against him, did not contain the date, time, and place, (Doc. 10 at 2–3; Doc. 14 at 9), and he attaches a copy to his brief as support. (Doc. 10-1). Thus, as a preliminary matter, Singh's argument is premised on facts and documents outside the pleadings.[12] The Court need not decide whether the OSC is

---

United States' Attorney's Office for the Eastern District of Michigan," was binding only on that particular district); *United States v. Crobarger*, 158 F. App'x 100, 107 (10th Cir. 2005) (holding that an Assistant U.S. Attorney in the District of Colorado "had no actual authority to bind the U.S. Attorney's Office for the District of Utah to file a Rule 35(b) motion on [defendant]'s behalf.").

[12] It is well settled that in ruling on a 12(b)(6) motion, the only materials a court may

properly before the Court, however, because Singh's contentions have no footing in *Pereira v. Sessions*.[13]

In *Pereira*, the Court was emphatically clear that it was addressing a "narrow question"—"Does a 'notice to appear' that does not specify the 'time and place at which the proceedings will be held,' as required by [8 U.S.C.] § 1229(a)(1)(G)(i), trigger the stop-time rule?" 138 S. Ct. at 2113; *id.* at 2110. In an 8-1 decision, the Court answered that question in the negative: "A putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a 'notice to appear under section 1229(a),' and so does not trigger the stop-time rule." *Id.* at 2113–2114; *see id.* at 2110.

Under 8 U.S.C. § 1229b(b), if a nonpermanent resident is subject to removal proceedings and has *inter alia* accrued 10 years of continuous physical presence in

---

consider, without converting the motion into one for summary judgment, are "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *See, e.g.*, *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008); *Stein v. hhgregg, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017); *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011); Fed. R. Civ. P. 12(d). Singh's 1993 OSC is not attached to the Complaint, but the Government does mention the same OSC in the Complaint and the validity of the immigration court's jurisdiction is central to the Government's claim in Count II. (Doc. 1, ¶¶ 16–17, 101–09).

[13] In any event, even if Singh were correct, and he is not, his jurisdictional argument only reaches the allegations in Count II, and the Government has stated numerous other grounds for revoking Singh's citizenship. Therefore, Singh's jurisdictional argument does not warrant dismissal of the entire Complaint.

*United States v. Karnail Singh*

the United States, the U.S. Attorney General has the discretion to "cancel removal" and adjust the status of the individual. 8 U.S.C. § 1229b(b); *Pereira*, 138 S. Ct. at 2109–10. The "stop-time rule" at issue in *Pereira* dictates that "any period of . . . continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) of this title." *Pereira*, 138 S. Ct. at 2110, 2114 (quoting § 1229b(d)(1)(A)).

Thus, the rule serves the obvious purpose of "prevent[ing] noncitizens from exploiting administrative delays to 'buy time' during which they accumulate periods of continuous presence." *Id.* at 1219. In holding that the stop-time rule is triggered only if the government serves a noncitizen with a proper "notice to appear" that contains the "time" and "place," the Court sought to avoid "empower[ing] the Government to trigger the stop-time rule merely by sending noncitizens a barebones document labeled 'Notice to Appear,'" *id.* at 2115, as the government admittedly had done in "almost 100 percent" of the cases before *Pereira* was decided. *Id.* at 2111.

Therefore, *Pereira* stands for the proposition that if a noncitizen is served with *proper* notice, that individual "stops" accruing "time" for purposes of meeting eligibility requirements for a discretionary order canceling their removal. And later, if that individual fails to appear, they "shall be ordered removed in absentia." *Id.* (quoting 8 U.S.C. § 1229a(b)(5(A)). By contrast, if a noncitizen is not served with proper notice, they continue to accrue time toward continuous presence in the country. *See id.* at 2114. In that case, if there is a failure to appear, he or she may

31

move to rescind the removal order entered *in absentia*. *Id.* at 2111.

Singh's sweeping construction of *Pereira* is without merit. Nothing in *Pereira*'s holding or *dicta* bars this action. *Pereira* made no mention of how or when jurisdiction vests with an immigration court. Nor does *Pereira* say anything about whether or not a deficient notice to appear deprives an immigration court of jurisdiction, voids a deportation order entered *in absentia*, and thereby precludes a court in a later proceeding (such as this) from considering that an individual had, nonetheless, misrepresented their involvement in deportation proceedings. *E.g.*, (Doc. 1, ¶¶ 29, 34, 58, 62–64, 96). But that is exactly the interpretation that Singh urges this Court to adopt. The Court will not accept that invitation.

Although *Pereira* was decided fairly recently, the Sixth Circuit has already had occasion to reject an argument similar to the one Singh now advances. In *Gomez-Domingo v. Whitaker*, No. 18-3547, 2019 U.S. App. LEXIS 491, at *1–2 (6th Cir. Jan. 7, 2019), the defendant argued "that jurisdiction never vested in the immigration court pursuant to 8 C.F.R. § 1003.14(a) because her notice to appear failed to specify the time of the hearing." The argument was rejected because "jurisdiction vests with the immigration court where . . . the mandatory information about the time of the hearing is provided in a Notice of Hearing issued after the [notice to appear]" or OSC. *See id.* (alterations in original) (quoting *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 315 (6th Cir. 2018) (decided post-*Pereira*); 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document

is filed with the Immigration Court by the Service."). "*Charging document[s]*" in "proceedings initiated prior to April 1, 1997," as in this case, "include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien." 8 C.F.R. § 1003.13. Regulations also require that the charging document include certain information.[14] But unlike the stop-time statute at issue in *Pereira*, the

---

[14] 8 C.F.R. § 1003.15(a)–(c) provides:

   (a) In the Order to Show Cause, the Service shall provide the following administrative information to the Executive Office for Immigration Review. Omission of any of these items shall not provide the alien with any substantive or procedural rights:

      (1) The alien's names and any known aliases;

      (2) The alien's address;

      (3) The alien's registration number, with any lead alien registration number with which the alien is associated;

      (4) The alien's alleged nationality and citizenship;

      (5) The language that the alien understands;

   (b) The Order to Show Cause and Notice to Appear must also include the following information:

      (1) The nature of the proceedings against the alien;

      (2) The legal authority under which the proceedings are conducted;

      (3) The acts or conduct alleged to be in violation of law;

      (4) The charges against the alien and the statutory provisions alleged to have been violated;

regulation "does not mandate that the time and date of the initial hearing must be included in that document . . . before jurisdiction will vest." *Hernandez-Perez*, 911 F.3d at 314 (quoting In re *Bermudez-Cota*, 27 I. & N. Dec. 441, 445 (BIA 2018)).

In the instant case, it is alleged that an OSC was issued on December 7, 1993, and was served on Singh on January 4, 1994. (Doc. 1, ¶ 16). That OSC, Singh maintains, was deficient and is attached to his motion to dismiss. (Doc. 10-1). But Singh allegedly appeared for an initial hearing and then was "served with a Notice of

---

(5) Notice that the alien may be represented, at no cost to the government, by counsel or other representative authorized to appear pursuant to 8 CFR 1292.1;

(6) The address of the Immigration Court where the Service will file the Order to Show Cause and Notice to Appear; and

(7) A statement that the alien must advise the Immigration Court having administrative control over the Record of Proceeding of his or her current address and telephone number and a statement that failure to provide such information may result in an in absentia hearing in accordance with § 1003.26.

(c) Contents of the Notice to Appear for Removal Proceedings. . . Failure to provide any of these items shall not be construed as affording the alien any substantive or procedural rights.

(1) The alien's names and any known aliases;

(2) The alien's address;

(3) The alien's registration number, with any lead alien registration number with which the alien is associated;

(4) The alien's alleged nationality and citizenship; and

(5) The language that the alien understands.

*United States v. Karnail Singh*

Hearing indicating the date and time of a *third* hearing," for which Singh "failed to appear." (Doc. 1, ¶ 17) (emphasis added). Singh does not contend that any of the information required by 8 C.F.R. § 1003.15 was missing from the subsequent Notice of Hearing.

As such, jurisdiction over Singh's deportation proceeding vested in the immigration court because "the mandatory information about the time of the hearing [was] provided in a Notice of Hearing issued after the [OSC]." *See Gomez-Domingo*, 2019 U.S. App. LEXIS 491, at *1–2 (quoting *Hernandez-Perez*, 911 F.3d at 315).

*Hernandez-Perez* therefore controls, and the misrepresentations that Singh allegedly made in response to immigration and naturalization application inquiries remain pertinent in determining whether Singh lacked the requisite "good moral character" for naturalization. *E.g.*, (Doc. 1, ¶¶ 29, 34, 58, 62–64, 96). Accordingly, the Court will not dismiss Count II.

For all these reasons, the Government has adequately alleged facts that support the revocation of Singh's naturalization on the grounds stated in Counts II–V, and therefore, Singh's motion to dismiss is DENIED IN PART.

## IV. CONCLUSION

Consistent with the accompanying Memorandum Opinion, and the Court being advised,

**IT IS ORDERED** that:

(1) Defendant's motion to dismiss (Doc. 6) be, and is hereby, **GRANTED IN**

*United States v. Karnail Singh*

**PART and DENIED IN PART;**

(2) Count I of the Complaint is dismissed **WITH PREJUDICE;**

(3) Defendant shall file an Answer to the Complaint **within (14) days** after entry of this order; and

(4) Thereafter, the parties shall have ninety **(90) days** within which to engage in discovery, which shall be completed no later than **June 26, 2019.**


This 14th day of March 2019.



**Signed By:**

**_William O. Bertelsman_**   *WOB*

**United States District Judge**

*United States v. Karnail Singh*